Alexander Del Giobjsto, J.
These four claims represent the separate fee claims of Behrer Holding Corporation and Behrer-Nason Company, Inc., the claim of General Foods Corporation, as lessee for the alleged value of the remaining term under the terms of a lease, and the claim of the Fund for Adult Education, the sublessee, for the value of its alleged fixtures installed in the premises on the date of appropriation. In addition thereto, Behrer-Nason Company, Inc., also claims for the value of its own fixtures.
The State, for its part, has filed a counterclaim against Behrer-Nason Company, Inc., for rents collected by this claimant from the lessee and/or sublessee from April 17, 1957, the date of appropriation, to October 17,1957, and the reasonable rent value of the remainder of the building to November 7, 1957, and for the entire building from November 17,1957, the date it is alleged Behrer-Nason reoccupied the entire parcel, to March 10,1958.
The State also filed a counterclaim against the lessee, General Foods Corporation, claiming that General Foods had collected $1,000 a month rent from the sublessee from April 17, 1957 to October 17,1957. This counterclaim, however, was dismissed at the end of the trial with the consent of the State.
Behrer-Nason owned a plot of ground of some 170 feet front by 200 feet long. On this plot, known as Map No. 350, there was a 2-story “ warehouse ” building, 100 feet wide by 200 feet long, with a garage attached on the rear, the dimensions of which were about 45 feet by 50 feet. To the east of the above plot and adjoining it, was an unimproved parcel 110 feet wide by 200 feet long. This was known as Map No. 351, and title to it was in Behrer Holding Corporation. These two corporations were interlocking family corporations and their interests were similar.
*390 Before we consider the respective claims and counterclaims, we should dispose of the legal relations of the lessee and, sublessee to the fee owner as well as to the State.
On May 19, 1955, Behrer-Nason Company, Inc., and General Foods Corporation, entered into a lease for the front portion of the second floor of claimant’s building containing approximately 11,700 square feet out of a total floor space of 19,000 square feet. The lease was for a term of five years, expiring June 30, 1960. The space was to be used for storage of records, office equipment, furniture and supplies. The rent reserved was $7,000 for the first year and $10,000 yearly thereafter. At the time of the appropriation, the rent was $10,000 yearly or $833.33 per month.
The lease was a regular Blumberg form lease. Certain paragraphs are pertinent to this decision. Paragraph 21, which was printed therein, provides as follows: ‘ ‘ That should the land whereon said building stand or any part thereof be condemned for public use, then in that event, upon the talcing of the same for such public use, this lease, at the option of the Landlord, shall become null and void, and the term cease and come to an end upon the date when the same shall be taken and the rent shall be apportioned as of said date. No part of any award, however, shall belong to the Tenant.”
Paragraph 28 (which was typed) provided: “Tenant shall have the right to install its own lighting fixtures in the premises and the right to remove the same upon the termination of this lease, provided such removal will not cause any structural damage to Landlord’s building.”
Paragraph 40 (which also was typed) provided: “Notwithstanding the provisions of paragraph 21st of this lease, the Tenant shall have the right, if it be so advised, to file a claim for damages by reason of condemnation against the governmental authority condemning said premises, provided that the Tenant agrees that it will make no claim against the Landlord,' and that any claim that it may make will be in addition to and not in diminution of any claim the Landlord may have by reason of such condemnation.”
On May 11, 1956, General Foods entered into a sublease of the space it had leased, with Fund for Adult Education. This sublease was for a term of nine months commencing on August 1, 1956, and ending April 30, 1957, and thereafter from month to month unless terminated by either party on 30 days’ written notice. The rental stipulated was $1,000 per month. The subtenant accepted all the terms of the original lease. The use thereof was specified to be for office purposes, and in addition, *391 the sublease gave the subtenant the right to install, at its own cost, partitions as well as make such alterations as were specified in an attached blueprint. There was attached to the sublease a consent by the landlord, Behrer-Nason Company, Inc., which provided:
“ b) That in the event of the condemnation for public use of the demised premises, or any part thereof, the sub-tenant shall have no claim to any award, except to a claim for the fixtures installed, or to be installed, in the demised premises by the sub-tenant, and that any claim which may be made by the subtenant shall be in addition to and not in diminution of any claim the Landlord may have by reason of such condemnation.
‘ ‘ c) That the condemnation for public use of the demised premises, or- any part thereof, and the termination of the term of the lease as the result of such condemnation, shall not be deemed to be a cancellation of the lease by the landlord, within the meaning of paragraphs ‘ 35th ’ and ‘ 36th ’ of the said lease, and the Landlord shall not be liable either to the tenant or subtenant for the payment of the sums of $3,000 and $2,000, respectively, pursuant to the terms of said paragraphs ‘ 35th ’ and 1 36th ’ aforesaid, and that all responsibilities of the Landlord shall cease and terminate on the date of the filing of the damage map in the office of the Clerk of the County of Westchester.”
Paragraphs ‘ ‘ 35th ’ ’ and ‘ ‘ 36th ’ ’ hereinabove referred to gave the right of prior cancellation.
It was testified that General Foods never physically occupied the said premises but merely painted and cleaned the same. However, Fund for Adult Education immediately proceeded to improve the rented space for office purposes and, concededly spent $24,372.96. The State conceded this sum was spent by Fund, but does not concede that all the items therein are compensable as fixtures. It was left for the court to determine whether Fund is entitled to compensation and if so, for what items therein.
Returning to the claim of General Foods, the court holds that it must be dismissed. A reading of the entire lease, and particularly the paragraphs quoted above, leads me to one conclusion, namely, that both parties agreed that “No part of any award, however, shall belong to the Tenant ’ ’. The appropriation was an entire taking, and, therefore, the part of paragraph 21 of the lease which reads: “ at the option of the Landlord ”, has no meaning whatever since there is nothing to “ opt ” for. This clause, implying an act by the landlord if it wished to keep the lease alive, would apply only if there had been a partial *392 taking of the leasehold by the State, which itself could be questioned by the tenant if the remainder were not reasonably usable.
Paragraph 28 retains the right in the tenant to remove, at the end of the term, lighting fixtures it had installed ‘ ‘ provided such removal will not cause any structural damage to Landlord’s building ’ ’. And in paragraph 40, the tenant is given the right to file a claim, “ Notwithstanding the provisions of paragraph 21st * * * provided that the Tenant agrees * *' * that any claim that it may make will be in addition to and not in diminution of any claim the Landlord may have ”.
In addition to all these conditions, the landlord again reasserted its position regarding the respective rights of the parties in the event of condemnation in its consent to the sublease to Fund. Thus, construing the entire contract, I find that the landlord is very much aware of its rights, and makes sure that it transfers no part thereof to the tenant. As a matter of fact, the landlord is specific in asserting its right to the fixtures themselves at the stipulated end of the sublease if their removal may cause structural damage.
The tenant is given the right to file a claim, it is true, but' only in addition to and not in diminution of that of the landlord. That cannot mean a claim in derogation of the fee. It can only mean a claim of personalty affixed to the realty in a way to have it constituted as a fixture. Only such claim could be in addition to and not in diminution of the landlord’s claim: a claim for the difference between the rent reserved and the actual value of the premises would be in diminution of the landlord’s claim, for it affects the reversionary interests of the owner in the realty, and under the circumstances indicated it may not be allowed. (Matter of City of New York [Whitlock Ave.], 278 N. Y. 276; Matter of City of New York [North Riv. Water Front], 192 N. Y. 295; Jackson v. State of New York, 213 N. Y. 34; Matter of City of New York [Allen St.], 256 N. Y. 236, 243; Matter of Mayor, etc. of New York, 168 N. Y. 254.)
Having disposed of the claim of General Foods, we take up the claim of Fund for Adult Education. That involves only fixtures. That claim is allowed as such but not in the amount claimed. Having examined the items of fixtures, I find that the three items of ceiling fixtures and fluorescent lights are personalty and easily removable. Their total is $700, which I disallow. I disallow the claim for painting which totals $5,883.10. Painting may not be considered a fixture. It may afford an increase in value of the building itself but it can never be removed. It has no value of its own which can be determined. *393 It is a capital investment in the owner’s fee and there it remains. Its value, here, is totally conjectural and therefore this item is disallowed. I disallow also $900 for three unit heaters which are removable and which were actually removed by claimant. These items total $7,483.10. Deducting that sum from the aforesaid claim of $24,372.96, I allow the Fund for Adult Education the sum of $16,889.86 for its fixtures, which will be indicated in the findings herein. Had General Foods installed these fixtures instead of its subtenant, the same award would have been made to it under the terms of the lease.
The remaining issue concerns the two fee claims.
With reference to the Behrer-Nason Company, Inc., and Behrer Holding Corporation, to which hereafter we shall refer as Map No. 350 and Map No. 351 respectively, the court notes that Messrs. Mandeville and Lane, the claimants’ two appraisers, describe the highest and best use as follows:
Mandeville: “The property and the improvements thereon are now being employed for their best and most useful purpose from the standpoint of the owners. There is a serious demand for this type of location because of it being impossible to duplicate anywhere in Westchester County. It is next to impossible for the owners to locate such a site that will allow them the benefits and privileges which they have established at this property over the last quarter of a century and now enjoy. This location is ideal for the present user.”
Lane’s testimony was: “Appraiser believes that the highest and best use of the property is for show room and office or supermarket. ’ ’
On the other hand, Mr. Keller, appraiser for the State, found the highest and best use of the building to be as it then was used by the owners even though portion of the second floor was being used by Fund for office space on a temporary basis of nine months or less.
The many photographs, maps and written descriptions furnished the court with an excellent idea of the structural aspects of the building and garage as well as the land involved.
It cannot be questioned that this building, erected by the owners themselves for their own wholesale plumbing and heating business, some 26 years before the appropriation, was a very well-built edifice, the front of it being artistically finished with glazed tile. The front had large windows, adaptable for a showroom or large store on the first floor and for office use or even display purposes on the second floor. The building was solid and strong. It was so erected that it could have sustained two additional floors above the present structure.
*394 The location was excellent for approach from any side. To its west it was some one-half mile or thereabouts from the White Plains area which had since the end of World War II, mushroomed miraculously with large department stores and office buildings owned or occupied by nationally known organizations. In the area to the south and east of its vicinity it was close to the exclusive office-campus zoned area occupied by General Foods, Allstate Insurance, Standard Vacuum, as well as campus type hospitals. North of it there was quite an extensive residential area.
Although this upsurge of industrial and residential development undoubtedly affected properties in the general area involved, it did not benefit the parcels in question as much as it might have had the claimants’ building not been there or had its interior been built with more flexibility of use. Assuming, however, that the owners vacated the building and offered it for rent, one may ask, what rent would they receive for the building in ‘‘ as is ” a condition? The court would say after a study of all the evidence available that the rent the owners may have gotten, on an over-all basis, would have been a maximum of $1.50 a square foot ($61,000 yearly). I will concede that because of the well-kept condition of the building and its accessibility to the bustling area of commerce that they may have received $2 a foot on a lease for a reasonable number of years. That, however, I consider speculative and will not use as a basis of an award.
I cannot accept the concept advanced by the claimant that this building could have been rented for $4 to $4.50 a square foot or even $3 a square foot “ as is ”.
This building was a concrete fireproof building, that is all. It was otherwise “ bare ”. The ceiling remained as an unfinished concrete ceiling, the floor the same. There were some 32 large mushroom-type columns in four rows from front to rear. There were in part gas ventilator heaters, pipes were exposed under the ceiling. For electricity there were bulbs hanging by a string of wire from the ceiling. There was a Peel freight elevator which either had to be closed off or changed to a passenger elevator. The rear portion of the building, being built against a bill, had no windows. To offer that as an office and modern showroom, would require completely new electrical installations and fixtures, a false ceiling to hide the pipes as well as an air-conditioning duct system, covering for the floors, additional plumbing and facilities for toilets and wash basins for men and women, radiators and connections, suitable and very likely fireproof partitioning, plastering and necessary changes in entrance and stairway. This would have entailed a very large expense, *395 but in addition thereto, it would not have brought in the rental projected because it still was not an “ original ” office building. It was still the neighborhood building which had been modernized.
I would rather feel that, since it was such a well-built fireproof building located on a parcel zoned for business, that to offer it as it was, represented the highest and best value under the circumstances, and I believe that $1.50 a square foot value for the two floors might have been the most rent it would bring, with the space in the cellar at about 50 cents a square foot and the garage at $1 a square foot. If the building was subdivided, I feel that the front may have rented at $2 a square foot and the rear at $1 a square foot, which is equal to the average of $1.50 a square foot I have allowed for the entire space on each floor. This is as far as I may permit myself to speculate with the rental value of the premises. I have done this to indicate that the court does not come to its final conclusions of value either at random or as a compromise of the various expert evaluations.
I find that the claimant, Behrer-Nason Company, Inc., has been damaged in Map No. 350 to the extent of $569,200. I arrive at this sum by allocating to the land, comprising 33,500 square feet, a unit value of $4 a square foot or $134,000; and to the building, garage and fence, a replacement cost of $512,000, but in view of the excellent maintenance of and condition of the building, I find there was only a 15% depreciation rather than the 26% mathematically assigned to it by Mr. Watson, the State’s building appraiser. While he figured the depreciation to amount to $133,134,1 find that it was only $76,800, which deducted from the replacement cost of $512,000, leaves the balance of the building at $435,200.
To Map No. 350 shall be added $6,500, the agreed reasonable value of the fixtures therein pertaining to the claimant.
The State filed a counterclaim in Map No. 350 for $7,000 a month rent for one year’s use of the improvements by the claimant after the appropriation. The claimant concedes that a fair rental for one year is due to the State, but not $84,000 as claimed. The court agrees with claimant’s contention.
At the end of the trial, a motion was granted to conform all the pleadings to the proof. Considering all factors involved and the testimony of the experts, I find that, although the claimant collected rent from the tenant, the same may be disregarded, since the fair value is to be considered here, not on rents collected, but on the highest use the building could be put to, to which I have already referred my attention. Accordingly, I find that $48,000 gross was the fair rental of the entire premises, and *396 award that sum to the State, which shall be deducted from claimant’s award, as provided in the judgment herein.
As to Map No. 351, I find that the 22,000 square feet were of the fair and reasonable value of $4 a square foot for the level area of 11,000 square feet, or $44,000, and for the 11,000 square feet in the rear, I give a value of $2.50 a square foot, or $27,500, making a total of $71,500, less $1,500 I find to be the value of the remaining plot, leaving a balance due of $70,000 for both direct and consequential damage.